**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PATRICK MCGLONE, SR.**<br><br>    **v.**<br><br>**PHILADELPHIA GAS WORKS, PGW** | **CIVIL ACTION**<br><br>**NO.  15-3262** |

<u>**MEMORANDUM RE: DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**</u>

In this disability discrimination action, Defendant Philadelphia Gas Works ("PGW") moves for summary judgment on Plaintiff Patrick McGlone, Sr.'s claims arising under the Americans with Disabilities Act ("ADA"), Pennsylvania Human Relations Act ("PHRA"), and Pennsylvania law.  Plaintiff, a long-time employee of PGW, contends that PGW subjected him to various forms of disability discrimination after he suffered an on-the-job injury and then returned to work physically impaired.  PGW seeks summary judgment on the ground that Plaintiff has failed to make out a prima facie case for any of his claims.  For the reasons discussed below, we agree with PGW and the motion will be granted in its entirety.

I.     **FACTS**

The following is a fair account of the factual assertions at issue in this case, as taken from PGW's Statement of Undisputed Facts and not genuinely disputed by Plaintiff.  Plaintiff began his employment with PGW in 1981 and worked there until his retirement on September 12, 2012.  ECF No. 37, Def.'s Mot. for Summary Judgment ("Def.'s Mot."), Def.'s Statement of Undisputed Facts ("DSOF") ¶ 1.  At the time that he retired, Plaintiff was employed as a Service Specialist in PGW's Field Services Department ("FSD").  <u>Id.</u> ¶ 3.  The duties of this position included performing, and training personnel on how to perform, service and repairs on utility appliances.  <u>Id.</u> ¶ 4.  On January 19, 2012, Plaintiff was servicing a PGW customer's heater when he "tried to stand and heard a pop and had a burning sensation" in his left knee.  <u>Id.</u> ¶ 45 (quoting

Def.'s Mot., Ex. FF (Record of Dr. Katz, Jan. 19, 2012)).  An MRI revealed that Plaintiff had suffered a tear in his medial meniscus, and he underwent surgery to repair it on February 17, 2012.  Id. ¶ 48.  Plaintiff applied for and received Workers' Compensation benefits in connection with his knee injury, and did not work from the date of the injury until on or around May 21, 2012, when his treating physician, Dr. Francine Katz, released him to return to PGW with certain medical restrictions.  Id. ¶¶ 46, 49.  The restrictions Dr. Katz imposed included: no climbing, no kneeling, no crawling, no squatting or crouching, no unprotected heights, no driving clutch vehicles, and no use of the left lower leg for foot controls, repetitive movements, or balance.  Id. ¶ 49.

When Plaintiff returned to PGW, he was assigned to light duty work in the Transportation Department (also known as "Fleet") that included, at a minimum, sweeping the premises, filing paperwork, and driving automatic vehicles.  Id. ¶ 63.  At some point during the summer of 2012, Plaintiff was transferred from Fleet back to FSD, where he was to perform only the training duties of the Service Specialist position and was told, at the outset, to "adhere to his restrictions[, . . . ] not bend [and] keep his hands in his pockets."  Id. ¶ 66; ECF No. 40, Pl.'s Opp'n to Def.'s Mot. for Summary Judgment ("Pl.'s Opp'n"), Ex. C (Dep. Tr. of Robert K. Smith) at 13:1-10.  The transfer was approved by PGW's Medical Director, Dr. Robert A. Barlow, as consistent with and within the scope of Plaintiff's medical restrictions.  DSOF ¶ 67.  On June 6, 2012, Plaintiff saw Dr. Katz and, according to her record of the visit, stated that he was "still having a lot of pain [but] finds that if he wears his brace he is good," was "tolerating work," "doing his job," and "doing training but . . . just not getting down on his knees as much as he used to."  Id. ¶ 68 (quoting Def.'s Mot., Ex. NN (Record of Dr. Katz, June 6, 2012)).[1]

---

[1] Plaintiff disputes this statement on the ground that it is hearsay but, under Federal Rule of Evidence 803(4), Plaintiff's statements to Dr. Katz were "made for—and [were] reasonably pertinent to—medical diagnosis or

At the June 6, 2012 visit, Dr. Katz modified Plaintiff's restrictions and indicated that Plaintiff was no longer restricted from climbing stairs.  Id. ¶ 69.  The following month, on July 3, 2012, Plaintiff had another appointment with Dr. Katz at which he indicated that he did not wish to continue treating with her and was going to be seen by Dr. Gerald E. Dworkin, "a pain management specialist that [Plaintiff had] been seeing . . . for other issues that he had from prior injuries."  Id. ¶ 70 (quoting Def.'s Mot., Ex. PP (Record of Dr. Katz, July 3, 2012)).  Plaintiff shortly thereafter underwent a procedure in connection with a back injury he had sustained separate and apart from his knee injury.  Id. ¶ 71.  On July 12, 2012, Dr. Dworkin amended Plaintiff's medical restrictions to indicate that he could "[c]ontinue limited lifting > 15 lb" and could not bend.  Id. ¶ 72 (quoting Def.'s Mot., Ex. RR (Record of Dr. Dworkin, July 12, 2012)).  On August 9, 2012, Plaintiff had a follow-up appointment with Dr. Dworkin after which the doctor noted that Plaintiff should be on light duty, with "no kneeling, bending, crawling, . . . [or] lifting > 10 lbs" through December 1, 2012.  Id. ¶ 73 (quoting Def.'s Mot., Ex. SS (Record of Dr. Dworkin, Aug. 9, 2012)).

Throughout this time period, from Plaintiff's return to work on or around May 21, 2012 onward, Plaintiff alternated between light duty work in Fleet and performing training duties as a Service Specialist in FSD.  Id. ¶ 75.  Whether these temporary assignments forced Plaintiff, in the face of his complaints, to violate his medical restrictions is a key part of Plaintiff's claims.

A separate facet of this case involves an incident between Plaintiff and one of his co-workers, Jeffrey Shapiro, and how PGW may have used it as a covert way to force Plaintiff to retire.  See, e.g., Pl.'s Opp'n at 40-42.  On September 11, 2012, the two men had a verbal altercation at work, after which Mr. Shapiro submitted a memorandum to the superintendent of

---

treatment; and describe[d] . . . present symptoms or sensations."  Fed. R. Evid. 803(4); ECF No. 44, Pl.'s Response to DSOF ¶ 68.  Therefore, the medical record upon which PGW relies in paragraph 68 of its Statement of Facts is not excluded by the rule against hearsay and is properly considered by this Court.

FSD accusing Plaintiff of threatening him.  Id. ¶ 21.  The following morning, PGW attempted to interview Plaintiff regarding the incident to determine if it constituted a violation of PGW's Workplace Violence/Threats Policy, but Plaintiff declined to participate in the interview and instead announced his intent to retire.  Id. ¶¶ 22, 24.  Plaintiff feared that if the investigation went forward and found him to have violated the policy, he would be fired and would therefore lose the lifetime medical benefits he and his family were due to receive from PGW.  Id. ¶ 29; Pl.'s Opp'n, Counter Statement of Undisputed Facts ("CSUF") ¶ 15.

Shortly following Plaintiff's retirement on September 12, 2012, Plaintiff submitted an application for Social Security Disability ("SSD") Benefits in which he represented to the Social Security Administration ("SSA") that he was disabled as of January 9, 2012 on account of the following medical conditions: torn rotator cuffs, herniated disc (back fusion), left bicep tendon tear, left meniscus tear, depression, high blood pressure, and cholesterol.  DSOF ¶ 34.  The SSA concluded that Plaintiff was disabled as of January 9, 2012 with a primary diagnosis of "Disorders of the back (Discogenic and Degenerative)" and a secondary diagnosis of "Osteoarthritis and Allied disorders."  Id. ¶ 35.  As a result, Plaintiff began to receive SSD benefits and he continues to receive them to this day.  Id. ¶ 37.

## II.    PROCEDURAL HISTORY

On June 10, 2015, Plaintiff filed a complaint against PGW (ECF No. 1) alleging:

1.  Disability discrimination under the ADA (Count I)

2.  Disability discrimination under the PHRA (Count II)

3.  Retaliation under Title VII of the Civil Rights Act of 1964 (Count III)

4.  Retaliation under the PHRA (Count IV)

5. Age discrimination under the Age Discrimination in Employment Act ("ADEA") (Count V)

6. Age discrimination under the PHRA (Count VI)

7. Wrongful discharge under Pennsylvania law (Count VII)

8. Breach of express contract of continued employment under Pennsylvania law (Count VIII)

On August 11, 2015, PGW filed a partial motion to dismiss, seeking dismissal of Plaintiff's Title VII cause of action as well as his claim that PGW breached his contract of continued employment (ECF No. 3). The parties agreed to a stipulation whereby Plaintiff would file an amended complaint (ECF No. 4) and as a result the Court denied the Motion to Dismiss as moot (ECF No. 6). On September 15, 2015, Plaintiff filed an amended complaint, adding the Utility Workers' Union of America AFL/CIO Local 686 ("Union") as a defendant (ECF No. 7). In the Amended Complaint, Plaintiff omitted Counts III and IV but otherwise maintained the same claims from his original complaint. For ease of reference in this Memorandum, the following are the Counts alleged in the Amended Complaint:

1. Disability discrimination under the ADA (Count I)

2. Disability discrimination under the PHRA (Count II)

3. Retaliation under the PHRA (Count III)

4. Age discrimination under the ADEA (Count IV)

5. Age discrimination under the PHRA (Count V)

6. Wrongful discharge under Pennsylvania law (Count VI)

7. Breach of express contract of continued employment under Pennsylvania law (Count VII)

PGW answered the Amended Complaint on October 8, 2015 (ECF No. 9).  The Union filed a motion to dismiss on November 25, 2015 (ECF No. 16), and Plaintiff responded on December 14, 2015 with a motion seeking leave to file a second amended complaint (ECF No. 17).  Plaintiff then filed a stipulation of dismissal of all claims against the Union (ECF No. 23), and the Court entered an order dismissing the Union on January 11, 2016 (ECF No. 25).  At the time of the Union's dismissal from the case, counsel for Plaintiff and PGW agreed that Plaintiff's breach of contract claim (Count VII) would be withdrawn.  Pl.'s Opp'n at 7.  On August 19, 2016, PGW moved for summary judgment (ECF No. 37), and on September 16, 2016, Plaintiff responded (ECF No. 40).  In his response, Plaintiff withdrew both claims for age discrimination (Counts IV and V).  Pl.'s Opp'n at 7.  PGW then filed a Reply on September 30, 2016 (ECF No. 43).  On October 10, 2016, Plaintiff moved for leave to file a sur reply and filed a supplemental counter statement of undisputed facts (ECF No. 44).  On October 17, 2016, PGW moved to strike Plaintiff's filing (ECF No. 45).  Oral argument was held on November 17, 2016 regarding the pending summary judgment motion (ECF No. 49).  The only Counts still pending are Counts I, II, III, and VI.

### III.    LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IV.  DISCUSSION

### a.  Admissibility of Plaintiff's Evidence

At the outset of the analysis, we address the admissibility of the declarations of Plaintiff's wife, son, and former co-worker, which together form a sizable part of Plaintiff's evidentiary showing. See Pl.'s Opp'n, Exs. F, G, I.

### i.   Declaration of Susan McGlone

Mrs. McGlone's declaration recounts several statements that Plaintiff made to her, each of which will be inadmissible for their truth and not considered at this juncture unless an exception to the rule against hearsay applies.  See Fed. R. Evid. 801(c), 802; Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").

Mrs. McGlone's statements that Plaintiff called her shortly after being forced to perform duties contrary to Plaintiff's medical restrictions qualify as present sense impressions under Federal Rule of Evidence 803(1) and are therefore admissible.  See Pl.'s Opp'n, Ex. F (Decl. of Susan McGlone) ¶¶ 6-10.  But, Mrs. McGlone's statements that Plaintiff told her he complained to various individuals at PGW about his assignments do not fall under any exception to the rule against hearsay.  See id., Ex. F ¶ 5.

### ii.   Declaration of Patrick McGlone, Jr.

Plaintiff's son's declaration likewise includes some admissible statements and some inadmissible ones.  Mr. McGlone Jr.'s assertions that he witnessed his father experiencing pain in his temporary position in Fleet are admissible.  See id., Ex. I (Decl. of Patrick McGlone, Jr.) ¶ 7.  Otherwise, the Declaration is replete with hearsay statements and statements that contain facts of which Mr. McGlone, Jr. does not have personal knowledge.  Specifically, Mr. McGlone Jr.'s averment that Plaintiff told PGW "over and over again" that he did not want to retire or resign but rather wanted to be re-assigned to a sedentary position is hearsay to which no exception applies.  Id., Ex. I ¶ 20.  As for the affiant's statement that he saw his father being harassed at work, Mr. McGlone, Jr. explained at his deposition that the only poor treatment he witnessed

Plaintiff suffer was being referred to as a "cripple" on one occasion and being the subject of a rumor started by a co-worker.  Pl.'s Opp'n, Ex. I ¶ 5; Def.'s Mot., Ex. AAA (Dep. Tr. of Patrick McGlone, Jr.) at 32:16-23, 41:20-23, 42:18-43:9.

Finally, Mr. McGlone, Jr. does not indicate any basis for his knowledge of the facts he relays in paragraphs 8, 9, 11, and 12 regarding his father being forced to use stairs throughout his temporary assignments in Fleet and FSD.  He also does not indicate his basis for stating that he "know[s]" that several PGW employees told Plaintiff that they were colluding to ensure he was terminated.  Pl.'s Opp'n, Ex. I ¶ 19.  For an affidavit to be considered on summary judgment, it "must be made 'on personal knowledge,' must set forth 'such facts as would be admissible in evidence' and must 'show affirmatively that the affiant is competent to testify to the matters stated therein.'"  Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985) (quoting Fed. R. Civ. P. 56(e)).  Mr. McGlone Jr. has neither shown that his statements in paragraphs 8, 9, 11, 12, and 19 are based on firsthand knowledge nor that he is competent to testify to the facts he relays therein. As such, we will not consider them in deciding this motion.

### iii.  Declaration of Bill Alburger

All probative statements in the declaration of Bill Alburger were retracted by Mr. Alburger, as evident in his affidavit dated May 16, 2016.  See Pl.'s Opp'n, Ex. G; Def.'s Reply, Ex. BBB.

### b.  Disability Discrimination under the ADA and PHRA (Counts I and II)

Plaintiff claims PGW discriminated against him on the basis of a disability in violation of the ADA and the PHRA.  Because Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact regarding these claims, they will be dismissed.

The Third Circuit has held that "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002). The only substantive difference between the Acts for purposes of this analysis concerns the definition of "disabled"; therefore, we will address that distinction but otherwise analyze Plaintiff's claims under Counts I and II together.

"A plaintiff presents a prima facie case of discrimination under the ADA by demonstrating:

1. He is a disabled person within the meaning of the ADA;
2. He is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and
3. He has suffered an otherwise adverse employment decision as a result of discrimination."

Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998) (emphasis added).

### i. Disabled

Due to the ADA Amendments Act of 2008 ("ADAAA"), the definition of "disabled" under the ADA is more relaxed than it is under the PHRA. See 42 U.S.C. § 12102(4)(A) ("The definition of disability . . . shall be construed in favor of broad coverage . . . to the maximum extent permitted by the terms of this chapter."); Szarawara v. Cnty. of Montgomery, No. 12-5714, 2013 WL 3230691, at *2 (E.D. Pa. June 27, 2013) (noting that "[t]he ADAAA relaxed the ADA's standard for disability, but the PHRA has not been similarly amended") (internal citations omitted). Although this distinction often necessitates a separate analysis under each statute, that is unwarranted here because a genuine dispute exists as to whether Plaintiff is disabled under the PHRA's more stringent standard.

To establish a disability under the PHRA, a plaintiff must demonstrate "an actual mental or physical impairment that substantially limits one or more major life activities."  Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274 (3d Cir. 2012).  Plaintiff has shown that he became impaired when he suffered an "acute sprain and strain with medial meniscal tear" on January 19, 2012 and that as of May 21, 2012, he was still suffering significant pain and was subject to "physical capability restrictions" of no kneeling, squatting, foot control, or climbing.  Pl.'s Opp'n, Ex. L (Pl.'s Medical Records) at 2-3.  Plaintiff has further presented evidence that on February 10, 2014 he had moderate to severe left knee pain that "occurs constantly and is worsening" and that is "aggravated by bending, climbing stairs, and walking."  Id., Ex. L at 7.  This factual showing is sufficient to establish a genuine dispute of material fact regarding whether Plaintiff is "disabled" under both the PHRA's more stringent standard and the ADA's more relaxed one.

### ii.  Qualified

In addition to establishing that he was disabled at the time of the alleged discrimination, Plaintiff must show that there is a genuine dispute regarding whether he was a "qualified individual" under the ADA.  The Act defines the term as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  To determine whether a plaintiff meets this definition, the court is to engage in a two-part inquiry.  First, a plaintiff has to show that he possesses "the requisite skill, experience, education and other job-related requirements of the employment position."  Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001) (quoting Deane v. Pocono Med. Ctr., 142 F.3d 138, 145 (3d Cir. 1998)).  Second, a plaintiff must demonstrate that he can perform the essential functions of the position, with or without

reasonable accommodation.  Id.  The determination of whether an individual is "qualified" is to be made at the time of the adverse employment decision.  Dogmanits v. Capital Blue Cross, 413 F. Supp. 2d 452, 460 (E.D. Pa. 2005).

Here, PGW does not dispute that Plaintiff possessed the requisite skill, experience and education to fulfill the requirements of the Service Specialist position.  See Def.'s Mot. at 13. Nor does PGW argue that Plaintiff lacked the ability to perform the essential functions of his position.  See id. at 12-17.  Rather, PGW contends that Plaintiff is estopped from arguing that he was qualified:

1. At any time after January 9, 2012 because of his representation to the SSA that he was disabled as of that date; and
2. At any time after his retirement because he testified during his deposition that he was unable to work in any capacity after that point.

We focus our analysis on these two estoppel arguments,[2] and find that Plaintiff's representation to the SSA does not irreconcilably conflict with his position in this litigation, but that his deposition testimony does.  Therefore, Plaintiff is precluded from arguing that he was a "qualified individual" at any point after his retirement, but may so argue for the time period between his return to work in May 2012 and his retirement on September 12, 2012.

### 1.  Estoppel

#### a.  Plaintiff's Statements to the SSA

PGW argues that Plaintiff is estopped from asserting he was qualified to perform his duties as Service Specialist at any time after January 9, 2012 because of his representations to the SSA that he was disabled as of that date.  We find that there is not a sufficient record of

---

[2] PGW has focused solely on the estoppel issue and has otherwise not identified any absence of a genuine issue of material fact on the issue of Plaintiff being a "qualified individual."  See Celotex, 477 U.S. at 323.  Therefore, after discussing whether Plaintiff faces estoppel, we will not engage in further analysis on the issue.

Plaintiff's factual assertions to the SSA such that those assertions can be deemed fundamentally inconsistent with his position in this litigation.

In Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999), the Supreme Court considered the extent to which a plaintiff could claim to the SSA that an injury rendered him too disabled to work, and then subsequently pursue an ADA claim in which he argued that he in fact had been qualified to work at the relevant point in time, notwithstanding the disability.  The Court established that in such a situation, "the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim."  Id. at 807.  This framework, rather than the traditional doctrinal approach to judicial estoppel, is applicable to summary judgment motions where the plaintiff takes a contradictory position to the one he earlier assumed before an agency.  Detz v. Greiner Indus., Inc., 346 F.3d 109, 117-18 (3d Cir. 2003).

In applying Cleveland, the court must look for "additional rationale to explain the plaintiff's apparent about-face concerning the extent of the injuries," such as "detail regarding the facts of his . . . case, demonstrating how the differing statutory contexts make[] [his] statements made under one scheme reconcilable with [his] claims under the other."  Motley v. N.J. State Police, 196 F.3d 160, 165 (3d Cir. 1999).  One key difference between the two statutes that is often determinative is that the SSA does not require consideration of whether a claimant could continue to work with an accommodation, whereas that analysis is central to the ADA's disability determination.  See Cleveland, 526 U.S. at 803.  This divergence often results in situations wherein an individual is "disabled" under the SSA but "qualified" under the ADA, because he is able to work with reasonable accommodation.  See id.

13

Having concluded that the <u>Cleveland</u> analysis applies to Plaintiff's case, we must address whether Plaintiff's claim to the SSA and his posture in the instant litigation are in genuine conflict.  Plaintiff filed an SSA claim for disability on October 2, 2012 in which he "allege[d] inability to function and/or work as of 1/9/2012" due to several maladies, including: "torn rotator cuff both, herniated disc (back fusion), left bicep tendon tear, <u>left meniscus tear</u>, depression, high blood pressure, [and] cholesterol."  Def.'s Mot., Ex. BB (SSA Disability Determination) at 277 (emphasis added).  He was determined disabled due to his back injury with an onset date of January 9, 2012, which is prior to when he suffered the knee injury at issue in this case.  <u>Id.</u>, Ex. BB at 286.  The SSA further found that he was capable of performing sedentary work notwithstanding his disability.  <u>Id.</u>, Ex. BB at 284.  Plaintiff has vouched for the statements he made to the SSA, testifying at his deposition that he filled out the SSD application, signed it, and represented to the agency that he was unable to work as of January 9, 2012.  <u>Id.</u>, Ex. A (Pl.'s Dep. Tr.) at 85:21-86:6.

In the instant case, Plaintiff takes the position that he was qualified to work in a sedentary position from May 2012 onwards.  Pl.'s Opp'n at 14-20.  On the record before the Court, which is almost entirely devoid of evidence of Plaintiff's factual assertions to the SSA, Plaintiff's litigation posture simply does not "'crash[] face first against' his prior claim" that he had a disability that prevented him from working as of January 9, 2012.  <u>Detz</u>, 346 F.3d at 120 (quoting <u>Feldman v. Am. Mem'l Life Ins. Co.</u>, 196 F.3d 783, 791 (7th Cir. 1999)).

In <u>Motley</u>, the Third Circuit drew a comparison between plaintiffs who make "a mere blanket statement of complete disability checked on a box in order to obtain pension benefits" and those who support their claim with "additional statements concerning the type and extent of [their] injuries."  <u>Motley</u>, 196 F.3d at 167.  It is a plaintiff in the latter group that is likely to face

estoppel when he asserts in an ADA case that he was in fact qualified to perform his job duties, because his assertions to the SSA would be "patently inconsistent with his present claims that he was a 'qualified individual' under the ADA."  Id.; see also Bisker v. GGS Info. Servs., Inc., 342 F. App'x 791, 795 (3d Cir. 2009) (holding that the plaintiff was not estopped from arguing she was qualified regardless of her earlier application for SSD benefits because "[t]he proper focus of the judicial estoppel analysis is not on [the plaintiff's] general contention that she is unable to work, but rather on the specific factual representations she made in support of that contention") (emphasis added).

Here, Plaintiff falls into the former group.  The only factual assertion that Plaintiff made to the SSA and that is on the record is a list of conditions that Plaintiff claimed rendered him disabled as of January 9, 2012.  See Def.'s Mot., Ex. BB at 277.  PGW contends that Plaintiff cannot now argue that he was a "qualified individual" after January 9, 2012 because he included his knee injury on that list of disabling conditions, and because he stated at his deposition that he had indeed "represent[ed] to Social Security disability that [he was] unable to work."  See id. at 12-17, Ex. A at 86:3-6.  We do not find those two factual representations sufficient to show an inherent conflict between Plaintiff's position in this litigation and his statements to the SSA. Indeed, it is not implausible that Plaintiff in good faith felt that his back and knee injuries rendered him incapable of performing the duties of his job without an accommodation, but that he felt he could have done so with an accommodation.

Having concluded that the statements Plaintiff made to the SSA are not facially inconsistent with the ones he makes in this litigation, we need not proceed with the Cleveland analysis.  Plaintiff's application for SSD benefits does not preclude him from arguing he was qualified after January 9, 2012.

**b.  Plaintiff's Statements at his Deposition**

PGW further contends that Plaintiff is precluded from asserting that he was qualified at any point after his date of retirement due to the statement he made at his deposition that he was "totally unable to work in any capacity . . . [a]s of the time that [he] retired."  Def.'s Mot. at 13, Ex. A at 93:5-11.  We agree.  Plaintiff's deposition testimony cannot be reconciled with his representation in this lawsuit that he could have worked an additional six years had PGW offered him a sedentary re-assignment.  Pl.'s Opp'n at 48, Ex. A ¶ 14 ("I do believe that had PGW offered me a sedentary position I could have performed it for the rest of my working life.").  Plaintiff attempts to explain this inconsistency by arguing that his "belief as to whether he was or was not able to work . . . depend[ed] on his feeling that [no] one would hire him."  Id. at 48.  But that is not what Plaintiff testified after a lengthy dialogue with PGW's counsel, which culminated in the statement that he "[was] totally unable to work in any capacity."  Def.'s Mot., Ex. A at 93:6-7.  We need not credit the portions of Plaintiff's affidavit that contradict his prior sworn testimony, as the former "is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for [Plaintiff]."  Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  Therefore, we find there is no genuine dispute as to whether Plaintiff was qualified to perform the essential functions of his position as of the date of his retirement.

In sum, because Plaintiff's deposition testimony fundamentally conflicts with his affidavit, we will not consider the subsequent affidavit, and conclude that no reasonable jury could find Plaintiff a "qualified individual" as of the date of his retirement.

### iii.  Adverse Employment Action

Having established that a genuine dispute exists as to whether Plaintiff was disabled and qualified between May and September 2012, the inquiry turns to whether PGW subjected him to an adverse employment action.  Plaintiff has failed to show a genuine dispute as to any material fact pertinent to this facet of the analysis.

### 1.  No Dispute Regarding Defendant's Provision of Reasonable Accommodation

An employer's failure to accommodate an employee's disability constitutes discrimination under the ADA.  Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).  Specifically, the Act's regulations provide that an employer will be liable when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  42 USC § 12112(b)(5)(A).  Both the ADA's regulations and the EEOC's interpretive guidelines discuss the process of identifying an appropriate reasonable accommodation as "a flexible, interactive [one] that involves both the employer and the [employee] with a disability."  29 C.F.R. Pt. 1630, App. § 1630.9 at 359; see 29 C.F.R. § 1630.2(o)(3).  An employer's failure to engage in this process can constitute a breach of the duty to provide reasonable accommodations.  See Williams v. Phila. Hous. Auth. Police Dept., 380 F.3d 751, 772 (3d Cir. 2004).

The Third Circuit has elucidated the requirements of what is commonly called the "interactive process," holding that both the employer and the employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."  Mengine v.

17

Runyon, 114 F.3d 415, 420 (3d Cir. 1997).  It is further the rule in this Circuit that "'an employer cannot be faulted if' the employee's actions or omissions during the interactive process cause the process's failure."  Colwell v. Rite Aid Corp., 602 F.3d 495, 507 (3d Cir. 2010) (quoting Taylor, 184 F.3d at 317).  The interactive process demands open communication between both parties, because "employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities."  Mengine, 114 F.3d at 420.

Here, Plaintiff contends that PGW discriminated against him by failing to engage in good faith in the interactive process, and by not finding him appropriate accommodations for his disability.  Pl.'s Opp'n at 23-24.  As to the latter argument, Plaintiff asserts that both his light duty assignment in Fleet and his modified duty assignment in FSD required him to violate his medical restrictions and therefore constituted failures to accommodate.  Id. at 23.  PGW counters with evidence showing that Plaintiff's restrictions were honored, Plaintiff never complained regarding the two positions at issue, and Plaintiff never requested a sedentary re-assignment or presented any medical documentation showing such re-assignment was necessary.

### a.  No Dispute Regarding PGW's Good Faith Engagement in Interactive Process

Plaintiff's failure to show that he complained about or indicated disapproval with any of his modified duty assignments is fatal to his claims that PGW violated the ADA and the PHRA by not engaging in the interactive process in good faith.

We assume for purposes of this analysis that Plaintiff triggered PGW's duty to engage in the interactive process as of his return to work on or around May 21, 2012, because that is when he alerted his supervisors that he had an impairment that necessitated a change in his job duties.

The Third Circuit has described the following actions as indicative of an employer's good faith effort to accommodate a disabled employee:

> "meet[ing] with the employee . . . , request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome."
> Taylor, 814 F.3d at 317.

Here, PGW has presented significant evidence showing that it did all of those things: it received information from Plaintiff's doctors, considered that information in deciding how to employ Plaintiff in his impaired state, assigned Plaintiff to a light duty position that it felt were within Plaintiff's restrictions, and consulted with its Medical Director to confirm that Plaintiff could switch from Fleet back to FSD to perform the training duties of his titled position. See Def.'s Mot, Ex. HH; DSOF ¶¶ 55, 67. PGW has additionally shown, via numerous affidavits, which Plaintiff has not disputed, that upon Plaintiff's move to FSD, he was informed that he was only to train personnel and was not to perform any other duties of that position that would be outside of his medical restrictions. See Pl.'s Opp'n, Ex. C (Dep. Tr. of Robert K. Smith) at 13:1-10 (Plaintiff was told to "adhere to his restrictions[, . . . ] not bend [and] keep his hands in his pockets."); Def.'s Mot., Ex. LL (Affidavit of Florence Riley) ¶ 9 (upon Plaintiff's transfer to FSD he was told to provide training "verbally and . . . not to perform any physical activity outside of his restrictions), Ex. MM (Affidavit of Dr. Barlow) ¶ 5 (stating that he "reviewed [Plaintiff's] medical restrictions and informed Mr. Smith that [Plaintiff] could train [c]adets so long as he abided by his medical restrictions.").

It is apparent that PGW made a good faith effort to assign Plaintiff to light duty work that it reasonably concluded comported with his restrictions and that, when it understood Plaintiff to want to return to his titled position, placed him back in FSD with modified responsibilities.

Conversely, there is no evidence apart from Plaintiff's affidavit and that of his wife, which merely repeats statements Plaintiff allegedly made to her, that Plaintiff was unhappy with either arrangement.[3]  Furthermore, the assertions in his affidavit that he "complained practically on a daily basis" and "filed all the complaints [he] knew how to file," are contradicted by his workers' compensation hearing testimony, at which he stated he felt his light duty assignments were "only fair."  Pl.'s Opp'n, Ex. A ¶¶ 11, 15; Def.'s Mot., Ex. U (Workers' Compensation Hearing Tr.) at 13:1-9.  Plaintiff's statements are additionally refuted by PGW's voluminous record evidence indicating it had no knowledge of Plaintiff's supposed discomfort in both positions.

As the Third Circuit stated in <u>Taylor</u>, "[p]articipation is the obligation of <u>both parties</u>, . . . so an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals."  <u>Taylor</u>, 184 F.3d at 317 (emphasis added).  That holding is squarely implicated here, where PGW attempted in good faith to engage in the interactive process with Plaintiff, as required by the ADA, and to reasonably react and respond to the information in its possession.  We do not find any genuine dispute regarding the good faith of PGW's attempts to find Plaintiff a reasonable accommodation.

### b.  No Dispute Regarding Modified Duty Assignments Given

Plaintiff additionally argues that the two temporary positions he held violated his rights under the ADA because they did not accommodate his disability.  These claims, too, must fail

---

[3] Plaintiff seems to argue that his statement to a supervisor "that he was bored and unchallenged in his current assignment [in Fleet], and would there be a way to use him in his titled position as a Service Specialist" constitutes proof that he complained.  Pl.'s Opp'n at 43, Ex. M (Memo. from Smith to Gioioso, Sept. 23, 2013).  This contention is spurious; stating that one is "bored and unchallenged" is not equivalent to communicating discomfort with, or inability to work in, an accommodated position.  In fact, we find the relevance of the cited statement to be that it belies Plaintiff's assertion that he was forced to return to the Service Specialist position against his will.  <u>See</u> Pl.'s Opp'n at 38-39.

due to a dearth of evidentiary support that either placement violated his restrictions or that he informed PGW of any concerns or complaints he had.  In light of the significant record evidence supporting the conclusion that PGW attempted to find Plaintiff a reasonable accommodation, and had no knowledge of Plaintiff's unhappiness or discomfort in either position, Plaintiff's conclusory affidavit is insufficient to overcome summary judgment.

First, Plaintiff alleges that his assignment to a temporary, light duty position in Fleet forced him to use stairs, which violated his medical restrictions then in place.  Pl.'s Opp'n at 37. In support of the claim that the position required the use of stairs and that he informed individuals at PGW that he was in pain and could not climb stairs because of his knee injury, the only admissible evidence Plaintiff relies on is his own affidavit and that of his wife.  See id., Ex. A ¶¶ 5, 6, Ex. F ¶¶ 6, 8, 9.  Second, Plaintiff alleges that his transfer back to FSD forced him to use stairs and to bend over in violation of the restrictions he had in place at the time.  See id. at 38, Ex. A ¶¶ 30, 31, 34, 35; Ex. F ¶¶ 7, 10.  Again, there is no evidence apart from Plaintiff's affidavit and that of his wife that he was required to use stairs or otherwise breach his restrictions.  To the contrary, the record shows that he was specifically told only to train personnel verbally and not to perform any of the jobs' duties that fell outside of his restrictions. See, e.g. Def.'s Mot., Ex. LL (Affidavit of Florence Riley) ¶ 9.  In addition, Plaintiff was only restricted from using stairs for the first thirteen days of his return to work, during some of which time he was in Fleet.  See id., Ex. OO (Record of Dr. Katz, June 6, 2012).  Finally, as to both positions, there is a dearth of evidence that Plaintiff ever voiced a single complaint regarding being forced to use stairs or otherwise violate his restrictions.

PGW counters Plaintiff's claims with voluminous evidence, summarized as follows:

- Plaintiff's testimony in his worker's compensation hearing that the light-duty position in Fleet involved tasks that were within his restrictions and were "only fair," and that while filing "[he] could sit down, and if [his] knee started to get stiff, [he] could get up and walk." Id., Ex. U (Workers' Compensation Hearing Tr.) at 12:14-13:9.

- The following testimony of Robert Smith, in PGW's Employee Relations, Development, and Support Services Department:

  o Plaintiff asked to be moved from Fleet so that he could perform work "within his skill set," which led to Plaintiff being reassigned back to FSD as a cadet trainer. Id., Ex. E (Dep. Tr. of Robert Smith) at 12:6-16, Ex. R (Affidavit of Robert Smith) ¶¶ 12-13, Ex. KK (Memo from Smith to Gioioso, Sept. 23, 2013).

  o Prior to Plaintiff's reassignment, Mr. Smith consulted with Dr. Barlow, who "reviewed [Plaintiff's] restrictions and concurred that [PGW] could use him [in FSD] as long as [they] met with [Plaintiff] and had the discussion telling him not to kneel." Id., Ex. E at 12:17-22.

  o Mr. Smith met with Plaintiff, another PGW employee, and Plaintiff's union representatives and indicated that they "would grant his request to be used in a training role and that he must adhere to his restrictions and not bend." Id., Ex. E at 12:23-13:3.

  o Mr. Smith told Plaintiff "to keep his hands in his pockets, . . . not to handle tools, . . . [and] just to observe the individual doing the work and

fill out the training paperwork at the end of each day." <u>Id.</u>, Ex. E at 13:4-8, Ex. R ¶¶ 11-12.

   o Plaintiff "was thankful that [PGW was] taking him back from [F]leet in a role that he could use his skill set." <u>Id.</u>, Ex. E at 13:9-10.

- The testimony of Michael McDonough, Plaintiff's union representative, that Plaintiff "never complained to [him] verbally or in writing that PGW or any individual employed by PGW was forcing him to perform any work that was outside of any of his medical restrictions, that was causing him to experience pain, or that he otherwise could not do." <u>Id.</u>, Ex. J (Affidavit of Michael McDonough) ¶ 16.

- The following testimony of Gary Gioioso, a supervisor in PGW's Human Relations Department:

   o He and another PGW employee evaluated Plaintiff's restrictions and spoke with a manager in Fleet who said he could accommodate Plaintiff's restrictions. <u>Id.</u>, Ex. N (Dep. Tr. of Gary Gioioso) at 25:6-18

   o "If at any time [Plaintiff] believed that he was in a position where it was too onerous for him[,] he certainly could have reached out to any [PGW supervisor] and at that point [they] would have taken [him] out of that job." <u>Id.</u>, Ex. N at 26:13-23.

- The testimony of Timothy Morrison, Superintendent in Fleet, that Plaintiff never complained regarding his placement in Fleet and that no employee in Fleet was forced to use stairs. <u>Id.</u>, Ex. JJ (Affidavit of Timothy Morrison) ¶¶ 14, 18, 22-24.

- The testimony of Florence Riley, one of the personnel who helped Plaintiff obtain his temporary assignments, that:
  - Upon Plaintiff's move back to FSD he was told to provide training to the cadets "verbally and . . . not to perform any physical activity outside of his restrictions." <u>Id.</u>, Ex. LL (Affidavit of Florence Riley) ¶ 9.
  - "[Plaintiff] never complained [to her] that he was being asked to perform work outside of his restrictions," nor is she aware of Plaintiff making any complaints to other individuals. <u>Id.</u>, Ex. LL ¶¶ 10-11.
- The testimony of Dr. Barlow, PGW's Medical Director, that Plaintiff was able to perform training duties as a Service Specialist if he abided by his medical restrictions and that Plaintiff never complained that he was being asked to work in such a way as to violate his restrictions. <u>Id.</u>, Ex. MM (Affidavit of Robert A. Barlow, M.D.) ¶¶ 5-6.
- The June 6, 2012 record of Dr. Katz:
  - "[Plaintiff] states that he has been back to work.  He is tolerating work.  He is doing his job." <u>Id.</u>, Ex. NN (Record of Dr. Katz, June 6, 2012).
  - "[Plaintiff] states that he is doing training but he is just not getting down on his knees as much as he used to." <u>Id.</u>
  - The record further includes a notation that although Plaintiff could not climb ladders, he could climb stairs. <u>Id.</u>

In light of the evidence recounted, Plaintiff's conclusory affidavit and that of his wife are incapable of raising a genuine dispute of material fact.  Specifically, the portions of Plaintiff's affidavit relevant to his failure to accommodate claim consist of general and vague statements

24

that in many instances contradict his sworn testimony both at his deposition and at his Workers'

Compensation hearing.  See Brightwell v. Lehman, 637 F.3d 187, 194 (3d Cir. 2011) (no clear

error in district court's grant of summary judgment where prisoner's cruel and unusual

punishment claim was based solely on prisoner's "own vague assertions and self-diagnoses" and

when "all of the record evidence . . . indicate that he received appropriate accommodations and

regular medical screenings"); Irving v. Chester Water Auth., 439 F. App'x 125, 126-27 (3d Cir.

2011) (where the plaintiff had previously testified during workers' compensation hearing that he

was not physically capable of performing his job and where all other record evidence indicated

as much, the plaintiff's "subsequent self-serving deposition testimony [was] insufficient to raise

a genuine issue of material fact" that the plaintiff was a "qualified individual" under the ADA);

Fulton v. Hakinberry, No. 14-1459, 2016 WL 4503336, at *4 (W.D. Pa. Aug. 29, 2016)

(summary judgment on Section 1983 claim granted where sole evidence supporting the

plaintiff's contention that the defendant had confiscated his wheelchair and that the plaintiff had

"repeatedly informed [the] [d]efendant about the difficulties he was having without his

wheelchair," was the plaintiff's declaration); Westawski v. Merck & Co., No. 14-3239, 2016 WL

6082633, at *11 (E.D. Pa. Oct. 18, 2016) (holding that "[i]n light of the other record evidence,

the [p]laintiff cannot rely on her self-serving deposition testimony to defeat [the defendant's]

motion for summary judgment").

It is important to note that Plaintiff's restrictions changed several times throughout the

summer of 2012, and that the evidence demonstrates that PGW continually attempted to work

with Plaintiff to find him temporary placements during those months.  If Plaintiff ever felt that he

was in a position where he was required to do things that he was physically incapable of doing, it

was his responsibility to openly communicate with PGW about that.  See Mengine, 114 F.3d at

420 (stating that "both parties have a duty to assist in the search for appropriate reasonable accommodation").  That is especially true in this case, where Plaintiff's restrictions were not static but rather a moving target.  The law does not charge an employer alone with the responsibility of monitoring an employee's restrictions and ensuring that all job assignments comport with them; indeed, Plaintiff had an important role in fostering a dialogue with PGW and it is one that he has failed to show he played.  As discussed above, "'an employer cannot be faulted if' the employee's actions or omissions during the interactive process cause the process's failure."  Colwell, 602 F.3d at 507 (quoting Taylor, 184 F.3d at 317).

Because Plaintiff has not raised a genuine dispute of material fact that PGW failed to accommodate his disability, his discrimination claims under the ADA and the PHRA (Counts I and II) cannot withstand summary judgment and will be dismissed with prejudice.

### c.  Hostile Work Environment under the ADA and PHRA (Counts I and II)

Plaintiff further claims that he was subjected to a hostile work environment in violation of the ADA and PHRA during the four months he was employed at PGW prior to his retirement. He has failed to raise a genuine dispute of material fact on these claims.

To establish a claim for harassment based on disability, Plaintiff must show that:

(1) He is a qualified individual with a disability under the ADA;

(2) He was subject to unwelcome harassment;

(3) The harassment was based on his disability or a request for accommodation;

(4) The harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment; and

(5) His employer knew or should have known of the harassment and failed to take prompt effective remedial action.

26

Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999).  The court's analysis as to whether these elements are established "must concentrate not on individual incidents, but on the overall scenario."  Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001) (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999)).  Certain factors that are relevant to this determination are: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Mandel v. M&Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 2013) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  "[T]he alleged conduct must be so 'extreme [as] to amount to a change in the terms and conditions of employment;'" therefore, "simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious)" will be insufficient to establish a hostile work environment claim.  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted); Church v. Sears Holding Corp., 605 F. App'x 119, 125 (3d Cir. 2015) (quoting Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005)).

### i. Plaintiff's Contentions

Plaintiff points to several bases for his hostile work environment claim.  First, he argues that his light duty assignments in Fleet constituted disability-based harassment because he had to perform "humiliating janitorial duties."  Pl.'s Opp'n at 25.  Second, he contends that the fact that he was forced him to use stairs in both of his temporary positions created a hostile work environment.  Id.  Third, Plaintiff states that he was called the following derogatory names by two of his coworkers at various points in the four months that he was working prior to his retirement: "bum", "cripple, "handicapped", "a janitor", a "delivery boy", a "gofer", someone who "could not do his job anymore", "not good anymore", and "useless."  Id. at 26, Ex. A ¶¶ 10,

27

22, 24.  Finally, Plaintiff characterizes his conflict with his co-worker, Mr. Shapiro, as having created a hostile work environment.  Id. at 26.

### ii.  PGW's Contentions

PGW counters that, first, because Plaintiff is not a qualified individual with a disability under the ADA, he cannot pursue a hostile work environment claim.  Def.'s Mot. at 23.  Second, PGW argues that Plaintiff fails to raise a genuine dispute as to whether his assignments in Fleet and in FSD were harassment and that Plaintiff could at any time have "refuse[d] such assignment[s] without penalty" but failed to do so.  Id. at 24.  Third, regarding the alleged animosity directed at Plaintiff by Mr. Shapiro, PGW points to testimony from Plaintiff demonstrating that any such animus "was the result of a personality conflict between Mr. Shapiro and [Plaintiff] which was unrelated to [Plaintiff's] knee injury."  Id.  Finally, PGW states that the name-calling alleged by Plaintiff is insufficiently severe to raise a triable issue.  Id. at 24-25.

### iii.  Analysis

Plaintiff's hostile work environment claim is incapable of withstanding summary judgment.  Regarding Plaintiff's argument that his work assignments somehow constituted harassment, the undisputed evidence demonstrates that PGW followed its internal procedures for finding light duty work for Plaintiff, including confirming with its Medical Director that Plaintiff could perform the duties of the assignments given, and shows that PGW believed the work accorded with Plaintiff's restrictions.  Even if there existed a genuine dispute regarding whether the assignments involved duties outside the scope of Plaintiff's medical limitations, Plaintiff has not shown that such assignments "subject[ed] [him] to unwelcome harassment" or that PGW's decision-making was motivated by disability-related animus.  Walton, 168 F.3d at 667.  There is

therefore no basis in the record to conclude that PGW's assignment of Plaintiff to light duty work in Fleet and to his training role in FSD constituted harassment.

As to Plaintiff's claim that he was subjected to derogatory name-calling, Plaintiff has provided scant details and meager evidentiary support of the alleged instances of harassment. Even if his conclusory affidavit and that of his son were sufficient to raise a triable issue, there is simply no evidence that the name-calling was "sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment." Walton, 168 F.3d at 667.

In Church v. Sears Holding Corp., 605 F. App'x 119 (3d Cir. 2015), the court considered a hostile work environment claim in which the plaintiff alleged only one "specific example of hostile conduct" and otherwise made broad statements, lacking in evidentiary support, about being subjected to hostility in the workplace. Id. at 126. As to the sole statement specifically alleged, the court held that it was "the kind of 'offhanded comment[]' generally insufficient to sustain a hostile work environment claim." Id. (quoting Caver, 420 F.3d at 262). Similarly, in Mercer v. Se. Pa. Transit Auth., 26 F. Supp. 3d 432 (E.D. Pa. 2014) the plaintiff alleged that he had been "constantly harassed" for being overweight, but only described one incident in detail. Id. at 445 (internal quotation marks omitted). The court there held that the "one particular incident of harassment" which had been described in sufficient detail for purposes of a hostile work environment claim was, standing alone, insufficient to sustain the claim at summary judgment. Id.

Here, too, the only harassing incident described with any specificity is that another PGW employee used the word "cripple" in a conversation with Mr. McGlone. See Def.'s Reply, Ex. EEE (Dep. Tr. of Patrick McGlone, Jr.) at 32:13-33:23. Otherwise, Plaintiff relies on the

generalized statement that, upon his return to PGW following his injury, he "received . . . a series of assignments that . . . subjected [him] to being called derogatory names like 'Bum', 'Cripple' and 'handicapped' (by Mr. Bob Smith and Mr. Jeff Shapiro)."  Pl.'s Opp'n, Ex. A ¶¶ 10, 22-24, 34.  Plaintiff's averments in his affidavit lack the detail needed to sustain a claim that he was harassed in a sufficiently extreme manner as to "amount to a change in the terms and conditions of [his] employment."  Faragher, 524 U.S. at 788.

   In addition to a lack of details regarding the alleged disability-related name-calling, Plaintiff's case is further hindered by an absence of evidentiary support for his allegations. Indeed, the conclusory statements in Plaintiff's affidavit, and the one statement in Plaintiff's son's affidavit, are all that Plaintiff offers as proof of his claim.  Several courts in this Circuit have found no triable issue of fact in situations where there is a similar dearth of evidentiary support.  See Priest v. Felcor Lodging Trust, Inc., No. 05-1181, 2006 WL 2709386, at *7 (W.D. Pa. Sept. 20, 2006) (where plaintiff alleged various instances in which she was not shown "appropriate respect" at work, court found that she "ha[d] produced no evidence, other than her own conclusory allegations, that these actions, or any other alleged actions, constitute a hostile work environment"); Grant v. Revera Inc., No. 12-5857, 2014 WL 7341198, at *14-15 (D.N.J. Dec. 23, 2014) (court "readily dispense[d] with [the] [p]laintiff's hostile work environment claim" where the plaintiff relied on "generalized allegations [of harassment]" and "presented [no] independent evidence tending to substantiate her claims that [her co-worker] acted in a harassing manner towards her," because the cited instances, even if related to her disability, were not severe enough "to create an abusive working environment to the reasonable person") (emphasis in original).

Finally, even if Plaintiff had set forth sufficient details and evidentiary support such that whether he was subjected to derogatory name-calling was a disputed issue of fact, it would not be a disputed issue of <u>material</u> fact because these incidents are insufficient, as a matter of law, to make out a claim for a hostile work environment.  In <u>Walton</u>, the court considered a claim where the plaintiff asserted five instances in which her supervisor made harassing comments to her, and held that the incidents fell far short of showing "the environment . . . to be objectively hostile or abusive."  <u>Walton</u>, 168 F.3d at 667; <u>see also</u> <u>Caver</u>, 420 F.3d at 262 (stating that offhand comments and isolated incidents cannot sustain a hostile work environment claim, unless extremely serious).

As for Plaintiff's assertion that the investigation initiated after Mr. Shapiro accused Plaintiff of threatening him somehow constituted harassment on the basis of his knee injury, there is absolutely no evidence to support this claim.  Rather, the record shows that PGW adhered to its workplace violence policy by initiating an investigation against Plaintiff following Mr. Shapiro's complaint that Plaintiff had threatened him.  <u>See, e.g.</u>, Def.'s Mot., Ex. L (Memo from Shapiro to Barry, Sept. 11, 2012), Ex. E (Dep. Tr. of Robert K. Smith) at 18:22-19:13.  In addition, even if Mr. Shapiro's allegations were solely meant to harass Plaintiff, there is no indication that the harassment was disability-related.  It instead seems clear that personality conflicts between the two men were the cause of any animus that may have led Mr. Shapiro to make false allegations against Plaintiff.  <u>Id.</u>, Ex. A (Dep. Tr. of Pl.) at 231:9-16; <u>see</u> <u>Walton</u>, 168 F.3d at 667 (where the plaintiff had a poor relationship with her supervisor and the supervisor had made offensive comments to her, the plaintiff "ha[d] not asserted facts that would allow a reasonable jury to find that [the supervisor] harassed her <u>because of her disability</u>") (emphasis added); <u>Uhl v. Zalk Josephs Fabricators, Inc.</u>, 121 F.3d 1133, 1137 (7th Cir. 1997) ("A

personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability.").

For foregoing reasons, Plaintiff has failed to raise a genuine dispute as to any material fact at issue in his hostile work environment claims under Counts I and II.  These claims will therefore be dismissed, with prejudice.

### d.   Retaliation under the PHRA (Count III)

Plaintiff also asserts that PGW retaliated against him for engaging in various activities protected under the PHRA.  Summary judgment is appropriate on this claim, as well.

Under the PHRA, a plaintiff bears the initial burden of establishing a prima facie case of unlawful retaliation.  <u>Marra v. Phila. Hous. Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007).  To meet this burden, a plaintiff must show that: (1) he was engaged in a protected activity; (2) he suffered an adverse employment action after or contemporaneous with his protected activity; and (3) there is a causal link between his protected activity and the adverse employment action.  <u>Id.</u> at 300. The Supreme Court has elucidated the standard for what constitutes an adverse employment action in this context, holding that the action must have been severe enough such that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 53, 68 (2006) (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotations omitted).

Plaintiff alleges the following protected activities and adverse employment actions:

(1) Plaintiff's return from worker's compensation leave → PGW placing him on light duty in Fleet.  Pl.'s Opp'n at 37.

(2) Plaintiff's complaints regarding his placement in Fleet → PGW maintaining him in Fleet.  <u>Id.</u>

(3) Plaintiff's complaints regarding his placement in Fleet → PGW assigning him to FSD.  Id. at 38.

(4) Plaintiff's complaints regarding his placement in FSD → PGW assigning Plaintiff back to Fleet.  Id. at 39.

(5) Plaintiff's submission of medical notes dated July 9, 2012 listing certain restrictions → PGW's failure to re-assign Plaintiff to a sedentary position and decision to maintain Plaintiff in Fleet.  Id. at 39-40.

(6) Plaintiff's communication to PGW that Mr. Shapiro was harassing him → PGW initiating a workplace violence investigation against Plaintiff.  Id. at 40-41.

PGW counters that there is no evidence that it took any adverse employment action against Plaintiff and that in addition, Plaintiff has failed to show a causal connection between his engagement in protected activities and any of the alleged retaliatory actions.  Def.'s Mot. at 29.

Plaintiff's retaliation claim suffers from a lack of evidentiary support.  First, as established above, there is no support for the claim that Plaintiff's light duty placement in Fleet was a demotion, or in any way an adverse employment action.  Second, Plaintiff cannot sustain his claim that complaints about his accommodation caused PGW to retaliate against him by maintaining him in the positions in Fleet and FSD.  Indeed, Plaintiff cannot point to any evidence that he in fact complained or indicated dissatisfaction with his placements, or that PGW's decision to keep him in either position was in fact retaliatory.  Third, the doctor's note at issue in Plaintiff's fifth claim of retaliation does not indicate that Plaintiff required a sedentary position, nor is there any evidence apart from Plaintiff's affidavit that Plaintiff requested being assigned to one.  There is furthermore minimal evidence that Plaintiff's duties in Fleet violated the

restrictions noted in the July 9, 2012 record.  Fourth, there is no evidence that Plaintiff notified PGW of any harassment at the hands of Mr. Shapiro or that PGW's decision to initiate a workplace violation investigation against Plaintiff was retaliatory.

Even if Plaintiff's retaliation claim did not fail due to a dearth of evidentiary support that any adverse actions were taken against him, it would fail because Plaintiff has not shown a causal link between the alleged protected activities and the actions PGW took.  The Third Circuit has held that "timing and evidence of ongoing antagonism" are the two main factors to consider in finding the existence of a causal link.  Abramson v. Wm. Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001).  Although there is temporal proximity between the activities and the actions, there is no evidence of ongoing antagonism.

In Abramson, the court held that the plaintiff had proved a causal nexus in her religious discrimination case because the retaliatory action—her termination—occurred shortly after the protected activity and because the plaintiff "cast[] doubt on the reasons [her employer] proffered" for firing her by "demonstrating that those reasons were vague and inconsistent."  Id. at 289.  The plaintiff had made a significant evidentiary showing that her employer's reasons for terminating her were not only unfounded but also conflicted with deposition testimony in which the employer stated that her performance had in fact been satisfactory.  Id. at 283-84.

The instant case contains none of the facts determinative to the court in Abramson. Indeed, Plaintiff has not pointed to PGW's reliance on "vague [or] inconsistent" reasons for placing or maintaining him in his temporary positions, nor has he shown that retaliatory animus informed either assignment.  See id. at 289.  Rather, Plaintiff lists a hodgepodge of supposedly antagonistic actions to bolster his argument that PGW retaliated against him, none of which are probative to this point.  First, Plaintiff cites PGW's initiation of a workplace violence

investigation against him as proof of antagonism, although all evidence points to the fact that PGW was merely following its protocol for responding to an accusation of the sort that Mr. Shapiro leveled against Plaintiff.  See Pl.'s Opp'n at 43.  Plaintiff's argument that PGW conducted "a sham, immediate 12 hour investigation" in order to punish Plaintiff for complaining about his restrictions being violated finds no support in the record and does not show antagonism.  Id. at 43.  Second, Plaintiff deems it noteworthy that PGW does not have "a single corrective action, complaint, or other document . . . explaining why PGW demoted, denied accommodations, [and] failed to reassign [Plaintiff]."  Id. at 44.  This argument is illogical—the reason PGW does not have any of the described documentation is because PGW never demoted, denied accommodation to, or discriminatorily failed to reassign Plaintiff.  As no adverse employment action was taken against Plaintiff, it is obvious that PGW would not have paperwork documenting the rationale for any such action.

In sum, because Plaintiff has failed to raise a genuine dispute that he was subjected to any adverse employment actions or that any of the actions he points to were taken out of retaliatory animus, summary judgment is proper on his retaliation claim.

### e.  Constructive Discharge under Pennsylvania Law (Count VI)

Plaintiff lastly contends that his retirement was in fact a constructive discharge from his employment at PGW.  This claim, too, cannot withstand summary judgment.

Pennsylvania applies a two year statute of limitations in wrongful discharge actions.  Anderson v. Consol. Rail Corp., 297 F.3d 242, 251 (3d Cir. 2002).  The statute of limitations in a wrongful discharge case begins to run when the plaintiff gives notice of his retirement.  Armington v. Sch. Dist. of Phila., 767 F. Supp. 661, 665 (E.D. Pa. 1991) ("the limitations period on [the] plaintiff's claim of constructive discharge . . . accrue[d when] the loss of employment

occurred"), aff'd, 941 F.2d 1200 (3d Cir. 1991).  Plaintiff asserts that he was constructively discharged on or about September 12, 2012.  See ECF No. 7, Amended Cmplt. ¶ 14.  In order to fall within the two year statute of limitations, Plaintiff would have had to file his case on or before September 12, 2014.  Because Plaintiff did not file suit until June 10, 2015, his constructive discharge claim is time-barred.  See ECF No. 1, Cmplt.

Assuming arguendo that the statute of limitations did not bar this claim, summary judgment would still be appropriate because Plaintiff has not raised a genuine dispute as to any material fact pertinent to the constructive discharge analysis.  An employee is constructively discharged where an employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996).  "To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."  Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 n. 4 (3d Cir. 2006) (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)).  A plaintiff who voluntarily leaves his employment may make a case of constructive discharge if "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign."  Goss v. Exxon Office Sys. Co., 747 F.2d 885 at 887-88 (3d Cir. 1984).

As discussed above in the context of Plaintiff's failure to raise a disputed fact as to his hostile work environment claim, Plaintiff has not shown sufficiently intolerable working conditions such that a reasonable person would be forced to resign.  See Spencer, 469 F.3d at 316 n.4.

## V.    CONCLUSION

For the reasons explained above, Plaintiff has failed to point out a genuine issue of material fact for Counts I, II, III, or VI, which are the only claims remaining in this case.  An appropriate Order will follow granting PGW's Motion for Summary Judgment in its entirety, and dismissing all Counts with prejudice.  The Order will additionally grant Plaintiff's Motion for Leave to File Sur Reply in Opposition to Summary Judgment (ECF No. 44) and deny as moot PGW's Motion to Strike Plaintiff's Supplemental and Responsive Counter Statement of Undisputed Facts (ECF No. 45).

O:\CIVIL 15\15-3262 mcglone v. phila gas works\15cv3262 memo re SJ.docx